Paul D. Odegaard
ODEGAARD BRAUKMANN LAW, PLLC
1601 Lewis Avenue, Suite 101
Billings, MT 59102
(406) 259-2222 – telephone
(406) 259-3232 – facsimile

Paul Toennis
GRAVES & TOENNIS, P.C.
2722 Third Ave. North, Ste. 301
Billings, MT 59101
(406) 259-7795 – telephone
(406) 259-5111 – facsimile



Attorneys for Plaintiff Danial Floyd

## MONTANA THIRTEENTH JUDICIAL DISTRICT COURT
## YELLOWSTONE COUNTY

| | |
|---|---|
| DANIAL FLOYD,<br><br>    Plaintiff,<br><br>vs.<br><br>ZURICH AMERICAN INSURANCE CO. OF ILLINOIS; PENNY HART, an Individual; and DOES B thru Z.<br><br>    Defendants. | CAUSE NO. DV 17-1264<br><br>ROD SOUZA<br><br>**COMPLAINT AND**<br>**JURY TRIAL DEMAND** |

COMES NOW Plaintiff, Danial Floyd, by and through his attorneys of record, and for his Complaint against Defendants, alleges as follows:

1. Plaintiff, Daniel Floyd ("Floyd"), was, at all times relevant hereto, a resident of the State of Texas, County of Grayson.

2. Defendant Zurich American Insurance Co. of Illinois ("Zurich") is an insurance company licensed to perform business in the state of Montana and its principal place of business is in Schaumburg, Illinois.



EXHIBIT A

3. Defendant Penny Hart ("Hart"), at all times relevant hereto, was a resident of Yellowstone County, Montana.

4. In October 2014, Floyd began employment with Hiland Partners LP ("Hiland" or "Employer"), which was based in Enid, Oklahoma, but operated oil and gas pipelines in the Montana and North Dakota Bakken Region. Floyd's employment with Hiland was based primarily out of Montana.

5. On December 18, 2014, Floyd sustained an injury to his lumbar spine while in the course and scope of his employment with Hiland.

6. Hart was the Montana in-state adjuster assigned by Zurich to adjust the workers' compensation claim filed by Floyd. Throughout the time Hart adjusted Floyd's claim, she was employed by Zurich.

7. The true names and capacities of Defendants named herein as Does B-Z, inclusive, are unknown to Floyd, who therefore brings this claim against said Defendants by such fictitious names. Floyd may seek leave to amend this claim to state the true names and capacities of Does B-Z, when the same have been ascertained, together with further appropriate charging allegations. Floyd is informed and believes and thereon alleges that each of the fictitiously named Defendants may be responsible in some manner for the occurrences and harms alleged herein and that Floyd's damages as herein alleged may have been proximately caused by said Defendants' acts or omissions, whether independently or while acting in concert with the Defendants. Defendants Does B-Z, inclusive, are natural persons, supervisors, agents, contractors, or other legal entities who may have caused or contributed to Floyd's injuries as alleged herein, while acting within the course and scope of their employment

COMPLAINT AND JURY TRIAL DEMAND - 2

and/or agency with the Defendants. As such, each unlawful act or omission and each violation of public policy is imputable to Zurich and Hart.

## JURISDICTION AND VENUE

8.  The Court has jurisdiction over the Defendants because they are doing business in the State of Montana and because each Defendant engaged in conduct that resulted in the accrual of a tort action in Montana.

9.  Venue is proper in Yellowstone County because Defendants engaged in tortious conduct that resulted in the accrual of a tort action in Yellowstone County, Montana, and Hart resides in Yellowstone County, Montana.

## GENERAL ALLEGATIONS

10. On December 18, 2014, while in the course and scope of his employment with Hiland, Floyd was traveling through Richland County, Montana, between jobsites when he noticed a flat tire on his work truck. After successfully removing several lug nuts from the tire, Floyd was having difficulties loosening two of the remaining lug nuts. Floyd began jerking and twisting the socket wrench, eventually resulting in the wrench slipping. When the wrench slipped, Floyd "felt three pops in his back" and his legs gave out on him causing him to fall to the ground.

11. On December 18, 2014, Zurich insured Hiland for workers' compensation liability.

12. Following the accident, Floyd laid in the snow for approximately 30 to 45 minutes until he was able to call his supervisors. Floyd's supervisor and a co-employee arrived and transported him to the Sidney Health Center Emergency Department where he was evaluated by Linda R. Klein, MD.

13. Floyd timely informed his Employer of the December 18, 2014, industrial injury and timely filed a First Report of Injury.

14. On the First Report of Injury, Hiland designated that it had no reason to question the accident and agreed that Floyd was injured while in Hiland's employment.

15. Upon receiving Floyd's claim of a work-related injury, and after investigating the claim, Zurich accepted liability for the workers' compensation claim without reservation and began paying wage loss and medical benefits.

### Floyd's Treatment in Montana

16. On December 18, 2014, Dr. Klein's diagnosis was compression fractures in the lumbar and thoracic spine. Dr. Klein's objective medical findings included paravertebral spasms over the mid-thoracic and lumbar spine along with abnormal CT scan findings, which showed three compression fractures in Floyd's thoracic spine and a compression fracture at L4. Dr. Klein made a referral to Ortho Montana Spine Clinic in Billings.

17. On January 7, 2015, Floyd presented to Dr. Alan Dacre, MD, at Ortho Montana Spine Clinic, reporting weakness, numbness, tingling, muscle cramps and twitching in both legs. Lumbar spine x-rays revealed a compression fracture of L4 and compression fractures in the midthoracic spine at T7, T8, and T9. Dr. Dacre opined that surgical intervention would be likely if the pain did not subside. Dr. Dacre did not release Floyd to work and recommended thoracic and lumbar spine MRIs.

18. On January 9, 2015, Floyd underwent the recommended MRIs with Dr. Leszek Jaszczak, MD, who diagnosed "an acute mild superior endplate compression fracture of L4" and opined that the "fracture is consistent with acute compression fracture secondary to hyperflexion injury."

COMPLAINT AND JURY TRIAL DEMAND - 4

19.   Throughout January and February of 2015, Floyd continued treatment with Dr. Dacre, who recommended surgery, although Floyd did not wish to pursue surgery at that time. Dr. Dacre continued to deny release to work.

### Floyd's Treatment in Texas

20.   In early March 2015, Floyd moved from Montana back to his home town of Denison, Texas. Floyd could no longer afford living in Montana due to the discrepancy between his pre-injury earnings and his workers' compensation wage loss benefits.

21.   With approval from Hart, Dr. Shawn Henry, a board certified orthopedic spine surgeon at the Texas Back Institute in Fort Worth, Texas, became Floyd's "treating physician" under M.C.A. § 39-71-1101.

22.   On April 7, 2015, Floyd had his first appointment with Dr. Henry. After reviewing medical history, MRIs and x-rays, and agreeing with the radiologist's findings that there appeared to be an L4 compression fracture, Dr. Henry concluded that Floyd had "[l]ow back pain secondary to work-related injury [in] which patient sustained a compression fracture of L4 back in early December." This remained Dr. Henry's assessment of Floyd throughout the time he treated him. Dr. Henry ordered a DEXA scan, lumbar spine x-rays, and a bone density study. He further prescribed a conservative approach for Floyd's pain, recommending a physical therapy program for 6-8 weeks and a series of prescriptions including a muscle relaxer, anti-inflammatory, and pain medication. All of the recommended diagnostic imaging and treatment was approved by Defendants.

23.   On April 14, 2015, Floyd began a physical therapy program with Jennifer Harris, PT, DPT, and he continued with the program through June 2015.

24. On June 3, 2015, Floyd underwent the ordered bone density assessment, which revealed Floyd had osteoporosis and osteopenia in the relevant areas of the spine.

25. On June 16, 2015, Dr. Henry prescribed additional medications for osteoporosis and referred Floyd to an endocrinologist, saying it would be unusual for a "50-year old male to have osteoporosis and start developing compression fractures." On a work status form, Dr. Henry opined that Floyd's medical condition resulted from the December 18, 2014, workers' compensation injury, and that the injury "prevented and still prevents the employee from returning to work."

26. On July 23, 2015, Zurich unreasonably and without explanation refused to authorize additional physical therapy even though the rehabilitation potential was designated as "Fair."

27. In July 2015, Hart wrote to Dr. Henry, requesting an opinion as to whether Floyd could be capable of returning to a modified duty job as a gauger, which would have required Floyd to regularly bend and stoop, lift up to 50 pounds up and down stairs and ladders, and walk about 5 miles per day. Dr. Henry responded: "No the patient does not meet the requirements to perform modified duties listed. He cannot perform any lifting, bending, or stooping."

28. On July 28, 2015, Dr. Henry recommended an epidural steroid injection. Defendants delayed approval of the injection and Floyd did not receive the injection until September 8, 2015.

29. Floyd returned to Dr. Henry on October 2, 2015. He reported no relief from the epidural steroid injection and rated his low back pain, leg pain, and middle-back pain each at a level "10." Dr. Henry opined that Floyd would likely need surgery.

30. Dr. Henry continued to prescribe conservative treatment. However, because the surgery would be extensive and complicated, Dr. Henry referred Floyd to the North Texas Pain Recovery Center to ascertain if he was a candidate for pain management. This referral was approved by Defendants.

31. On October 20, 2015, Floyd underwent an assessment for pain management at the North Texas Pain Recovery Center with Kenneth N. Walker, PhD, a psychologist; Brian Caplan, MD; and Jim Mallard, PT, MTC. Dr. Walker diagnosed Floyd with chronic pain syndrome secondary to low back pain. Dr. Walker concluded that Floyd "was an appropriate candidate for an interdisciplinary rehabilitation program that focuses on functional restoration."

32. Dr. Caplan reviewed Floyd's medical records and further diagnosed Floyd with "[c]hronic pain syndrome due to osteoporotic compression fractures of the thoracic and lumbar spine with marked and subsequent restriction of range of motion of the back, possibly related to the fact that he had not received physical therapy for a prolonged period following the injury." Dr. Caplan also concluded that Floyd was an appropriate candidate for the pain management program.

33. Mallard, PT, also assessed Floyd in a Functional Capacity Evaluation and noted that Floyd "demonstrated significant restrictions and limitations but has also displayed good rehab potential." PT Mallard concluded that Floyd "would benefit from an interdisciplinary rehabilitation program."

34. In November 2015, following the evaluations, North Texas Pain Recovery Center requested authorization from Zurich of 80 hours of pain management treatment for

Floyd. This recommended treatment was consistent with the Montana Arbitration and Treatment Guidelines.

35. Rather than to approve the pain management treatment recommended by the medical professionals, Hart, on behalf of Zurich, did not respond to the request. Without explanation, Hart refused to authorize the recommended pain management program and instead scheduled Floyd for an independent medical examination ("IME").

36. On December 1, 2015, Floyd underwent an IME with Bernie L. McCaskill, MD, in Dallas, Texas. One-third of Dr. McCaskill's practice includes doing such IMEs. Dr. McCaskill reviewed only 11 of approximately 30 medical records before examining Floyd and preparing his report.

37. Dr. McCaskill's IME report contained two significant mistakes. First, Dr. McCaskill incorrectly recorded that the emergency room report from the date of injury included "no description of objective abnormal physical findings," whereas Dr. Klein's did observe objective physical findings, including muscle spasms and abnormalities found through objective observation and within the CT scan during emergency room visit. Second, Dr. McCaskill incorrectly noted that Floyd's fractures were likely long-standing and not from a work-related accident on December 18, 2015 because "there was no documentation of thoracic complaints until six months following the work related event." This is also incorrect, as both the emergency room report and Dr. Dacre's January 7, 2015 report documented thoracic complaints within one month after the event.

38. Relying primarily upon his recorded mistakes, contrasting conclusions, and his belief that Floyd had been lying about his pre-accident symptoms, Dr. McCaskill determined that Floyd's "clinical history makes no clinical sense and no common

sense." Dr. McCaskill also questioned whether Floyd's L4 compression fracture was "truly work related" and posited the fracture was of "undetermined age and etiology" because it was "possible that the compression fracture noted at the L4 level was also spontaneous and occurred some time prior to the work related event of 12-18-14." Dr. McCaskill contradicted himself by later noting that "the lumbar MRI scan of 1-9-15 are consistent with a compression fracture that occurred sometime over the previous 6-12 weeks."

39. Dr. McCaskill opined further that Floyd had reached MMI for "any injury that he sustained while working on 12-18-14" because he believed that the patient had "undergone all reasonable and appropriate treatment" and would not benefit from any additional supervised medical treatment. Dr. McCaskill further stated that Floyd had no physical restrictions and that "by this date he should be able to return to his preinjury work despite such injury." Assuming that the L4 compression fracture was the result of an industrial injury, Dr. McCaskill then assigned Floyd a Class 2, 14% whole person impairment rating under the 6th edition to the *Guides to the Evaluation of Permanent Impairment*.

40. Relying solely on Dr. McCaskill's IME report, and ignoring all of the other medical evidence and opinions in her file, Hart terminated Floyd's TTD and medical benefits, refused to pay Floyd the Class II impairment award for the 14% whole person impairment rating, and rescinded its acceptance of liability for Floyd's claim.

41. On December 15, 2015, Floyd presented to Dr. Henry reporting severe pain in his low back and legs. Dr. Henry again requested completion of a chronic pain

management program before any possibility of surgery was discussed further. Dr. Henry, as Floyd's treating physician, determined that Floyd was not at MMI.

42. Because of Zurich's and Hart's denial of further liability, Floyd would not receive any medical treatment for over a year, compromising his medical result and causing him excruciating pain.

43. Floyd was forced to litigate the Defendants' unreasonable denial of medical and wage loss benefits. As a result, Floyd did not receive any form of workers' compensation wage loss benefits for over a year.

44. After being provided the complete medical history, Dr. McCaskill testified at his deposition that it was his opinion that it is more likely than not Floyd did, in fact, sustain an L4 compression fracture as a result of the December 18, 2014 workplace injury. Dr. McCaskill also agreed that bending over and pulling on a tire iron was a mechanism of injury for an L4 compression fracture.

45. Dr. McCaskill also acknowledged the significant mistakes in his report. He admitted that, contrary to the statement in his IME report, the emergency room report from the day of the incident included objective abnormal physical findings, i.e., muscle spasms, and that both the emergency room report and Dr. Dacre's January 7, 2015, report documented thoracic complaints earlier than six months after the accident.

46. Even with Dr. McCaskill's concession that Floyd's L4 compression fracture was compensable, Hart and Zurich forced Floyd to present his case before the Montana Workers' Compensation Court ("the Court") in July of 2016. The Court determined that Hart's testimony in some respects was "false" and, in many other, respects unreasonable and "absurd." The Court determined that Hart and Zurich's actions were

COMPLAINT AND JURY TRIAL DEMAND - 10

unreasonable because they terminated Floyd's benefits based upon Dr. McCaskill's causation opinion that was stated without regard to Montana's legal/medical causation standard, i.e. on a more probable than not basis.

47.  The Court also found that Hart and Zurich's denial of Floyd's benefits was unreasonable because they "did not fairly and reasonably evaluate the facts ... and blindly accepted Dr. McCaskill's opinion simply because, by [Hart's] own admission, she accepts the IME physician's opinion in every claim[.]"

48.  The Court also found that the conduct of Hart and Zurich was unreasonable because they failed to reinstate Floyd's benefits after Dr. McCaskill's unequivocal deposition testimony that Floyd had, in fact, sustained an L4 compression fracture at work on December 18, 2014, "thereby completely undermining the reason Zurich terminated Floyd's benefits." The Court then determined, based upon the entire medical and factual record, that Floyd was not at MMI for his lumbar condition and that he was entitled to TTD benefits back to the date of termination, prospective TTD benefits until such time that he becomes ineligible under Montana Workers' Compensation law, and further medical benefits as recommended by his treating providers.

49.  The Court also determined that Hart and Zurich's conduct was unreasonable such that it justified imposition of costs, attorney's fees and a 20% penalty on benefits.

## FIRST CAUSE OF ACTION – COMMON LAW BAD FAITH

Floyd realleges paragraphs 1 through 49 of this Complaint and Jury Demand and adopts the same as fully set forth herein.

50. This Cause of Action is brought pursuant to common law as set forth by the Montana Supreme Court's decisions of *Brewington v. Employers Fire Insurance Company*, 297 Mont. 243, 992 P.2d 237 (1999), *O'Fallon v. Farmers Ins. Exchange*, 260 Mont. 233, 859 P.2d 1008 (1993), *O'Fallon v. Farmers Ins. Exchange*, 260 Mont. 233, 859 P.2d 1008 (1993), and *Vigue v. Evans Products Company*, 187 Mont. 1, 608 P.2d 488 (1980).

51. Defendants owed Floyd an implied in law duty of good faith and fair dealing in the adjustment and processing of Floyd's Montana workers' compensation claim. Defendants' common law duties included the duty to investigate and adjust the claim based upon all available information in a reasonable, fair and timely fashion.

52. Contrary to this duty and without justification, Defendants acted and/or conspired to avoid the obligations owed Floyd under Montana law by unreasonably delaying authorization of recommended and necessary medical care, refusing and/or failing to follow the medical directives of Floyd's treating providers, and engaging in a continuous course of tortious conduct. In doing so, Defendants breached their duty of good faith and fair dealing.

53. Contrary to this duty and without justification, Hart acted to avoid the obligations owed to Floyd under Montana law by refusing and delaying authorization of the medical care and benefits that Floyd was entitled to by virtue of the workers' compensation coverage in question and by operation of law. As the agent and employee of Defendant Zurich, the actionable conduct of Hart is imputable to Zurich by operation of law.

54. Each Defendant was in violation of Montana common law.

55. Floyd acted in good faith in his dealings with the Defendants.

56. The Defendants' breach of the implied covenant of good faith and fair dealing and the common law directly and proximately caused Floyd to suffer economic damges, emotional distress, and pain and suffering.

## SECOND CAUSE OF ACTION – UNFAIR AND DECEPTIVE PRACTICES IN VIOLATION OF MONTANA INSURANCE CODE

Floyd restates and alleges the previous allegations as though fully set forth herein.

57. This Cause of Action is brought pursuant to § 33-18-242, MCA, and § 33-18-201(1), (4), (6), and (13), MCA, of the UTPA.

58. Defendants have the duty to understand and apply the law as it relates to well-established principles involving insurance and workers' compensation claims arising in the State of Montana. Further, Defendants have the duty to handle claims arising under a Montana workers' compensation policy in accordance with standards applicable to the insurance industry and made mandatory by § 33-18-201, MCA *et seq.*

59. The Defendants failed to comply with their obligations under the law, violating § 33-18-242, MCA, and § 33-18-201(1), (4), (6), and (13), MCA, in the following respects:

   a) Misrepresented pertinent facts or insurance policy provisions relating to coverage at issue;

   b) Refused to pay Floyd's claim fully and fairly without conducting a reasonable investigation based upon all available information;

   c) Neglected to attempt in good faith to effectuate prompt, fair, and equitable settlement of Floyd's claim for which liability was reasonably clear;

    d)    Failed to timely respond to Floyd's requests, and unlawfully delayed payment of Floyd's lawfully owed benefits;

    e)    Unlawfully cut off Floyd's lawfully owed benefits in direct violation of Montana law;

    f)    Attempted to force Floyd to settle his claim for an amount less than its true value as a result of placing Floyd in an unfair financial position due to its wrongful termination of his lawfully owed benefits;

    g)    Failed to adopt and implement reasonable standards for the prompt investigation of claims arising under Zurich's Montana Workers' Compensation insurance policies;

    h)    Compelled litigation forcing Floyd to recover amounts due and benefits due under the Zurich Workers' Compensation policy by refusing to retract its "unacceptance" of the claim when it became obvious that the sole medical opinion it relied upon for its denial changed and supported compensability of the claim; and

    i)    Failed to handle Floyd's claim with reasonable promptness and fairness.

60.    Each Defendant has breached their duties of good faith and fair dealing that are owed to Floyd under Montana law.

61.    Each Defendant engaged in a continuous course of tortious conduct which violated § 33-18-201(1), (4), (6), and (13), MCA.

62. The Defendants' unfair and deceptive practices, in violation of § 33-18-242, MCA, and § 33-18-201(1), (4), (6), and (13), MCA, directly and proximately caused Floyd to suffer damages and losses and entitle Floyd to an award of compensatory damages.

63. The Defendants' unfair and deceptive practices, in violation of § 33-18-242, MCA, and § 33-18-201(1), (4), (5), (6), and (13), MCA, were fraudulent and malicious, and warrant imposition of punitive damages pursuant to §§ 33-18-242(4) and 27-1-221, MCA.

## THIRD CAUSE OF ACTION – INTENTIONAL AND/OR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

Floyd restates and alleges the previous allegations as fully set forth herein.

64. Defendants engaged in a continuous course of tortious conduct which inflicted emotional distress upon Floyd.

65. Defendants' conduct was intentional and/or grossly negligent.

66. Floyd suffered severe emotional distress and damages as a direct and proximate result of the Defendants' conduct.

## PUNITIVE DAMAGES

Plaintiff restates and re-alleges the previous allegations as though fully set forth herein.

67. Defendants' conduct as alleged herein constitutes actual malice as defined by Mont. Code Ann. § 27-1-221, so as to compel an award of exemplary and punitive damages.

68. Defendants had knowledge of facts or intentionally disregarded facts that created a high probability of injury to Plaintiff, and deliberately proceeded to act in a conscious or intentional disregard, or indifference, of the high probability of injury to Plaintiff.

69. Defendants' conduct was so malicious, willful, and egregious as to justify an award of punitive damages to punish Defendants and to serve as an example to similarly situated individuals and entities that conduct of the kind engaged in by Defendants is unacceptable in our society.

70. Plaintiff is therefore entitled to an award of punitive damages in an amount the jury deems proper under the circumstances.

## JURY DEMAND

Floyd demands trial by jury on all issues so triable.

## PRAYER FOR RELIEF

1. Reasonable compensation for compensatory damages resulting from the Defendants' breach of the implied covenant of good faith and fair dealing, statutory bad faith and common law bad faith;

2. Damages for Floyd's severe emotional distress;

3. Punitive or exemplary damages in an amount sufficient to serve as an example to said Defendants and other similarly situated individuals and entities that conduct of the kind engaged in is unacceptable and will not be tolerated;

4. For Floyd's costs of suit incurred herein;

5. For such other and further relief as the Court deems just and proper.

DATED this 23rd day of August, 2017.

                GRAVES & TOENNIS, P.C.

                ODEGAARD BRAUKMANN LAW, PLLC

                BY: _____
                    Paul D. Odegaard
                    1601 Lewis Avenue, Suite 101
                    Billings, MT 59102
                    Attorneys for Plaintiff